May it please the Court, my name is Carol Sobel, and I represent the appellant this morning. I'd like to reserve five minutes for rebuttal. This case comes before the Court from a summary judgment and an order granting fees against a discrimination plaintiff from the district court central district. The issue is whether the district court improperly assessed the evidence through inferences against the plaintiff, as opposed to in favor of the plaintiff, as the district court was required to do, and whether there was sufficient evidence of pretext in this case to move this case beyond the summary judgment motion and to trial. And it is plaintiff's position that there were at least eight different bases on which pretext could be found. Kennedy You're not talking about the discrimination claim, not the harassment claim. Are you talking about both? Sobel Well, in terms of the pretext at this point, Your Honor, I'm talking about the discrimination claim first. Kennedy Right, okay. I just want to make sure we're on the same page. Sobel Okay. She filed a section 1983 claim and a section 1981 claim as a Hispanic female. First of all, this circuit has held that superior qualifications alone could be evidence of pretext. In this instance, under both Rod and Odeema, this Court's decisions in Rod and Odeema, the plaintiff meets her burden simply on the basis of her qualifications. She was the top scorer in the first two rounds of interviews here. She's so far outdistanced the white male who was selected over her. Ginsburg Was she the top scorer in the first two rounds? I thought that was someone else who was. Sobel There was someone else who dropped out of the yes, Your Honor. She was, she was, she finished with 30 points. Somebody else had 35. I believe somebody else had 30 points as well. But Mr. Poindexter, who was ultimately selected, is being finished with 18 points in the middle of the pass. Ginsburg That's a different go ahead. Kennedy Was there evidence that the defendant knew she was the top scorer? Sobel Well, I believe that there was, Your Honor, for two reasons. One, because he had before him all of the materials that were used by the lower groups. And in looking at her materials, I think that the point here is, is that in terms of, of, of that, he had all the material, which he admitted to saying that he had all that material. But the second point, Your Honor, is that the fact that all of these different people could look at the applications of these two candidates and come to the conclusion that she was so much markedly better would indicate that the defendant as well, would likely reach the same conclusion. And that if he didn't reach the same conclusion in a situation where there was nothing even close between the two candidates in terms of their past experience, then there would have to be some pretext operating here, some discriminatory basis. And that's a reasonable inference for a jury to draw, particularly when you look at the other issues of pretext in this case. Kagan Council, before we leave that, is it your position that the defendant had the interview score sheets? Well, it's not clear that he had the interview score sheets. He testified in his deposition that he had everything. He had the application packages and everything from the proceedings below. But it's not clear. But he specifically said that he did not know the scores from the – okay. That's correct, Your Honor. The second issue of pretext in this instance is that there had never been a female Hispanic hired in an administrative academic position in this district. And there had never been a female Hispanic hired by this defendant. In fact, the only minority this defendant ever hired into an academic administrative position was one male, one Hispanic male, who had left his position during the course of this. Counsel, how many – I'm sorry, Your Honor. But he doesn't hire females and he doesn't hire minorities. He hired a minority in an academic position. The other two were in nonacademic positions. Somebody was the custodial staff. Somebody else had a similar position. He didn't hire females. He hired a few females. Most of the people transferred over in a reorganization of the schools that was done not by him, but by the board shortly before he took over as president. But he hired no women of color. And this Court has directed in Lam that there is a different analysis applied when there is an intersection of race and gender and the hiring of white females alone does not indicate that there is an absence of discrimination. Counsel, how many females of color had applied and were subject for consideration? Well, that is not clear, Your Honor. And the reason that is not clear is because the only statistical evidence that the district had was incomplete and inaccurate. How can we draw a negative inference from him not hiring any women of color if we don't know whether he had the opportunity to consider hiring women of color? Well, I think that a jury could, Your Honor. And a jury could look at these statistics. For instance, they indicated that there were applicants of color in, I believe, 11 of 21 positions for which they had records. And yet none had ever been hired except in one position where there was a male. The Court doesn't have to draw the final inference, negative or positive. The Court has to simply determine whether a jury could draw an inference in favor of the plaintiff and whether that could be drawn when all of the evidence is looked at together. So in addition to her qualifications and the absence of any woman of color ever hired in this instance, in fact, the only woman of color that was in a position when the defendant took over, he sought and he successfully had her contract not renewed. So the Dr. Mary, the only person of color, woman of color that ever held a position, administrative position, was not renewed by him as soon as he became the president. When you look at the criteria in this instance for the job, the ultimate criteria he used for selection were the issues of the distance learning, the fundraising issue, and the health sciences curriculum. Well, the person he selected, the white male, did not have any experience in any of those areas, and he had no experience in any of the other areas of administration here. The baseball field issue became a clearly pretextual issue because it allowed him to decide that plaintiff was not a, quote, team player, a purely subjective criteria, when in fact she never had responsibility for raising that money. And the, and the evidence is indisputable from her former dean that she did not have responsibility for that. It was a non-issue, yet it became a deciding issue when he was searching for reasons. When the defendant was asked what were the criteria for developing the health science curriculum in the distance learning, he could not articulate them. So he selected, I think a jury could reasonably draw the inference, that given the two, and given no other basis not to select her, he looked for some smaller reasons in this application process. And it should be noted that he floated this application process twice. The first time around, plaintiff was one of 12 people. The second time he went and did it, plaintiff was one of 18 people who applied. In addition, you have an applicant here, not only was not qualified, but had no, no references from his immediate employer. When asked if the defendant had checked his immediate employer to determine whether his representations about his experience and skills were correct, he said he did, but he lost the notes. In fact, as became clear just three months into this job, no one had ever called to check his references. And this was critical because his earlier references were a student he had taught 10 years earlier, somebody he had co-coached a basketball team with, and the only person who had ever supervised him said he could not speak to his administrative skills because it was not part of his job responsibilities, not part of Poindexter's job responsibilities. So essentially, they had no indication, no supporting evidence that he was qualified under any of these skills. When asked why he chose Poindexter, then Mather began to disassemble. And he said, well, he didn't choose him, his vice president recommended him. His vice president testified at his deposition that was patently untrue. And he and Mather misrepresented the truth in this instance in several other key aspects. He said he did the supplemental reference checks. He didn't. He said that Rockmore recommended that Poindexter be hired. That was not true. And then he said that he had Rockmore investigate the allegations by Professor John Lowe that there were problems with this individual early on, which goes both to his pretext and his dishonesty and certainly to the hostile work environment claim. In fact, when Rockmore investigated Lowe's allegations by calling his former employer, he found out that they were true and not, as Mather testified, that they were untrue. All of that would lead a jury to think that perhaps something else was going on here and what was going on was discriminatory intent. And then the district judge rejected all of the evidence of other instances in which Mather had declined or expressed extraordinary resistance to hiring a woman or a woman of color. In the instance of the organic chemistry professor, he said the business people wouldn't deal with her. She was a prime candidate. In the instance of the biology professor, where she was clearly the number one candidate and the department made that absolutely clear that there was no one who came even close to this particular woman, he did not hire her on some pretext of not wanting to be accused of reverse discrimination for hiring somebody who was South Asian and he's South Asian. Well, the woman wasn't South Asian to begin with. She was a woman of color, but not South Asian. But secondly, that would not be a permissible basis for not hiring someone who is the top candidate. When it came to the female basketball coach, the district judge dismissed it as unsubstantiated opinion about why he did not want to hire the far more qualified, far more qualified female basketball coach. It was not the district court's role to classify this information as unsubstantiated opinion. This is particularly the type of information that this Court has indicated in McJanus and other decisions may be used to create an inference of discriminatory intent. Kennedy, anything about the harassment claim? Yes, Your Honor.  Okay. In terms of the harassment claim, there was no investigation done in this instance until after the filing of a written formal complaint. It's clear that in January, when Professor Lowe wrote that we was – There was evidence that the guy was a mean guy to everybody, but as soon as the – as soon as the allegations were of sexual and maybe racial harassment or sexual harassment, they immediately started an investigation. There's plenty of stuff out there that the guy was unpleasant to deal with by a lot of people. Well, Judge Kaczynski, I think that the evidence was that he was unpleasant to women and minority males. He changed the schedules of women and minority males in favor of white males. That's what the evidence is. I understand there were complaints from white males as well. No. I apologize, Your Honor, but a white male co-signed the discrimination complaint because he had witnessed the treatment of the others. There is no complaint from a white male. There are only complaints from the female secretary he assaulted, the student assistant he assaulted, the black male administrators whose schedules he changed, the female dance instructor. The student assistant was what? The student assistant was South Asian, I believe. It was a woman, South Asian. There is not a single white male who complained because he – in every instance, he – and he didn't ask to speak to the white males in his office alone. He made that a condition of speaking to the women behind a closed door. He didn't change the schedules of the white males. He changed the schedules of the women and the minority males, the full-tenured professors in those instances. He changed the schedule of the dance instructor. He gave the plaintiff classes that he knew would get canceled, putting her in jeopardy of being out of compliance with her contract to carry a certain teaching load. There is not a single white male who filed a complaint against him based on discrimination against them. But this is an investigation. Investigation came along and said, yes, he certainly harasses people, but he harasses everybody. Well, that – because the investigation concluded that does not mean it's true, when, in fact, the only people he targeted were women and men of color. Is there any – is there any challenge to the objectivity of the investigators? Other than the fact that they were the district's lawyers, I don't think that that's – that there was a challenge to their objectivity. There was a challenge to their conclusion. When the only people targeted are women and minorities, that they could conclude that he was – treated everyone unequally. But there's a critical issue to that investigation, Your Honor. The investigation was begun in April after a formal written complaint was filed, long after other notice was given to the district that there were problems. There were no investigations done up until that point. You have two assaults by the time the investigation is filed, his female assistant and then the student assistant. When the investigation is filed, the investigation specifically asks that he be taken out of the workplace. He was not taken out of the workplace, despite the fact that, as the investigation detailed, he had touched one female in meetings, he operated with a closed door, he told other females, why are you resisting me? He had assaulted a number of people. My client was working with a baseball bat at that point and being escorted to her car. And shortly after that was filed is when he comes to her workplace where she – she had moved herself from the main workplace, so she would not have contact with him, and puts her in physical – even greater physical fear for her safety. The only time at which he's removed is four months – more than four months after the investigation begins, when he assaults the black male coach. And that is when he is brought – he's taken out of the environment. Until that time – and my client continued to work there for ten weeks after this complaint was filed, before she quit. But until that time, he was left in the workplace, despite repeated requests that he be removed. And I would note that the investigation said he should be removed from the workplace. It is not – the holdings of this circuit are clear that when someone presents a physical danger, particularly, but in any event, but certainly when they present a physical danger, as this individual did, that an investigation alone is insufficient adequate remedy for a threatened and actual hostile work environment, and that you must remove the individual from the workplace. Nothing was done until he assaulted the third person. And that is inadequate. I do want to just – am I into my rebuttal time? You see a number in front of you? 336. Okay. I think I'm smaller than what you plan to. Okay. I will just – I think, Your Honor, that we want to be really clear that there was no evidence of a frivolous claim here, and that the fees that were awarded by the district court were improper. They were awarded primarily because the district court took offense that a public official was sued in his individual capacity. We brought to the Court's attention the decision of the Eleventh Circuit three weeks ago in – four weeks ago in Quintana v. Jenny, in which the Eleventh Circuit held that – that frivolity cannot be found where a prima facie case has been made simply because the plaintiff doesn't prevail on her pretext. I would ask for a remand to a different district judge. Most certainly I would ask for that. If the Court weren't inclined to remand, which I hope the Court is, I would certainly ask for a different judge. I'll reserve my remaining time. Good morning, Your Honors. If it pleases the Court, my name is Dennis Walsh. I'd like to start out by just maybe touching, based on a few of the statements that plaintiff's counsels made. First of all, there's a lot of assumptions and arguments being made by counsel, which were made in the summary judgment and are now made here, that are not supported by the facts. This case is about what undisputed material facts existed at the time, and putting this case in perspective, this is not a discrimination case against an employer. This is a 1981 claim against an individual, and that, I think, poses – an inquiry against the individual, which I think will dovetail into my argument about the attorney fees and why we didn't have a lawsuit against the employer in this case under Title VII or 1981 or 1983. But in any event, for example, counsel continues to harp on the fact that her client had superior qualifications to the other candidate. I remind the Court that there are no disputed facts that plaintiff presented to the lower court regarding the hiring process. The hiring process was not disputed by the plaintiff at all. Well, what are you saying? Are you saying that the plaintiff did not have superior qualifications? What I'm saying is there is no evidence that the plaintiff had superior qualifications. Well, isn't that a question of fact then? No. There is no question of fact because the plaintiff wants to argue a standard of this court and the lower court not even looking at pretext. That's what the superior qualification doctrine argues. And in order to accomplish that, the plaintiff's got to show clear evidence that there was superior qualifications. What evidence regarding qualifications was in the record? The only evidence Dr. Mather had was they were both on equal footing when they came to him. The Court was right. But that is not the only evidence of qualifications. There is the fact that there was – one of them had 30 points, the other one had 18 points. Actually, it was 31 and 28, Your Honor, not 31 and 18. Which time are you talking about? As I understood from the record, and I'm pointing to – There was never a time when he was ahead of her in those numbers, right? No. The rankings for the final review – I'm sorry, I didn't hear your answer. No, he was not ahead of her. He was behind her by three points. She was ahead of him. By three points. Each time, the first time, she was way ahead of him. He was seventh. The problem, though, Your Honor – Counsel, he was seventh in the first one. For the initial screening. Right. And then they did a full-on interview where they asked questions and they ranked each of the candidates in person, not based on their resume. The interview committee did this, not Dr. Mather. Dr. Mather, who's being the only defendant in this case, had no involvement in any of that. All he does is say, okay, you bring to me the final three people you want me to consider. If the interview committee thought that Poindexter was such a horrible candidate, they wouldn't have recommended him. Counsel, that's not true. Because didn't Professor Lowe say that he did not want to recommend Mr. Poindexter, but he didn't have a choice because they had to recommend three people and there were only three people left? No. The only problem with that argument is what he said was that he could have also said the interview – Mr. Carlson asked you a question. Well, I'm going to answer the question. Did Dr. Lowe say that or not? My recollection is that he did say that, but he also admitted that the interview committee – Counsel, it's always good to answer the question. Fair enough. Okay. If you think we don't notice that you don't, you're sadly mistaken. I appreciate that. He also testified that the interview committee, if they wanted to, could have not recommended any candidates and they could have started the entire process  Where is that in the record? I don't have it in front of me, Your Honor. The other point is that you pointed out, Justice, is that Dr. Mather did not have those score sheets, and that fact is undisputed. So when the candidates came to him for final interview, he was not aware that one candidate – You make a lot of that, but I don't see why that matters, what this does make. Well, it matters because the ultimate decision-maker has to be in a position to – He may not have the ratings, but he certainly has the qualifications. Yes, from the resume, from their resumes. Right. So if he picks somebody with a lesser qualification, you can draw an inference of discrimination from that. Whether he knows the early ratings, he doesn't know the early ratings. Well, but there's no evidence in the record that she had superior qualifications to him. She had certain qualifications he didn't have, yet – How about the fact that before the interviews, he got rated way down the list? When they just looked at the credentials, when they just looked at the paper, they gave him 18 and they gave her 31. So here's a group of people who looks at the credentials, rates not based on personality or ability to be smooth in an interview, or other subjective factors, basis entirely on the record, and he gets way lower than she would. Now, can't a rational jury say, well, anybody looking at those papers – You know, we're not experts, we don't know what's required, but the experts look at them, and she gets rated way higher than he does. So presumably, when he looks at the papers, he would realize that her papers are much higher than hers, just like the committee. You know what, Your Honor? I would agree with you if there was evidence Dr. Mathers saw those papers. Counsel, is it your argument that the hiring official would not look at the resumes? No, that's not my argument. He did look at the resumes, but Justice said that a reasonable jury would infer that him looking at the interview sheets and seeing how the other people ranked him, he didn't do that. No, no, no. I don't think you listened. I think you're about the only person in this courtroom that didn't hear my question. What I said is, they look at the resume and other credentials and they gave a rating, right? He looks at the resumes and other credentials, and presumably, his reading of them would be about the same as his colleagues, because they all know what these papers mean. So if he got rated so much lower than she did when they looked at the papers, presumably, he'd look at the same papers, not at the rating sheets, at the credentials, and he'd say, hmm, you know, she really has much better credentials than he does. There's the note. Isn't that a plausible inference a jury could draw? I don't think I'd... And I'm going to give him the job anyway, because he's a guy and we can play golf together. That would be great if they didn't play golf together, but I understand. It turns out he was better with baseball bats, but that would be there for him. That would be something for the jury to decide. In hindsight, it's always 20-20. In this case, obviously, that was a situation where the hiring didn't work out. But to answer your question, Your Honor, I think it didn't work out. I think it's just sort of an understatement. Well, there's some other evidence as to some other issues that were going on apart from that that are not before this Court. But I would agree with you that... Why are you mentioning them? Why are you saying this? If it's something that's there that's not, that you're not going to allude to, that's not before this Court, you think you could just sort of sneak it in? No. So prejudice is a jury? I think that plaintiff's counsel tries to use in their brief the after-the-fact evidence, which in fairness to Dr. Mather, who's being sued here personally, he was not privy to at the time he made his decisions, that's all. Sure, if he would have known at the time that this guy was not going to work out and he had this propensity, maybe he would have made a different decision. Well, that maybe could have come to light if there had been a check of his references. There's a dispute in the record regarding whether or not the references were checked. There were letters that were stale dated. There were letters that were undated. And so if there had been a reference check, perhaps this information would have come to light. I agree with you 100%, Your Honor. And the interview committee was... Whereas her reference, she was local, so we knew that there was a check of her references because she was the local candidate, right? Yes, there was no need to check her. How about the fact that he doesn't bother to check out his references? Why isn't that an evidence of pretext? The interview committee was responsible for checking references, and Dr. Rockmore, not Dr. Mather, that was not his responsibility. Counsel, listen. As the hiring official, if he's getting ready to hire someone and there is not a reference check, if there is not a note saying, I've checked the references, here is what I found, wouldn't that trigger an inquiry? Why would someone go ahead and make a hiring decision if the committee has not checked the references and that information is not provided? That doesn't make sense. I'm not suggesting that, Your Honor. I believe the record is that references were checked, but there were stale references that were checked based upon the references he provided. What counsel is alluding to is that there was a gap in his resume. He didn't have the last employer on his resume, and the interview committee did not check that. And, in fact, everyone in the interview committee also stated that they did not notice. In fact, I think Mr. Lowe testified, he didn't notice as well that there was a gap in his resume. Where is there in the record that the references were checked? I'll have to look, Your Honor. I don't have it in front of me. My understanding is that Dr. Rockmore testified in his deposition that he had checked references and provided that information to Dr. Mather. All right. And that Dr. Mather, so in other words, to try to put it in perspective, and I agree with you, that this is a process that this Court may not necessarily agree with. This may be a process that in hindsight may appear to be one that could have been better handled. But to suggest that when Dr. Mather follows that process, whether it's a good one or a bad one, that it automatically means it's discrimination is not, in my opinion, a logical, a logical lead. I don't think anybody's claiming it automatically means discrimination. I think the claim is that it raises inferences of discrimination that ought to be put to a jury. I don't think I remember the plaintiff's short summary judgment, which would be the automatic thing you're talking about. All they're saying is, look, this looks very suspicious. The guy, when they wanted a higher chemistry teacher, said, no, he won't go with a woman because she's, the industry won't deal with her. When they have to pick the basketball coach, he goes with a male and a female for bogus reasons. There is, you know, this failure to make sure that references have been adequately checked. And there's the fact that her credentials were, at least the jury could find, were so much better than hers, and he should have known that, and he goes for the guy with the lesser credentials. Why is this a jury case? Why isn't this the kind of thing? I'm sure that once it comes before the jury, Dr. Maddow will get a chance to say his piece. I'm sure that the jury can make up its mind whether it believes him or not. The reason it shouldn't have gone before a jury, Your Honor, is in reference to some of the matters that you brought up. Can I hear the end of your sentence? Sure. The reason it shouldn't is that some of those facts that were stated by the court are not necessarily accurate. In fact, he hired a female, Patricia Spencer, in one position. One of the declarants that the plaintiff relies upon complained that he hired a female basketball coach when there was a male that was more qualified. So those declarations don't pan out to show any tribal issue. In fact, on the contrary of those declarations, two or three women were ultimately recommended for hire by Dr. Maddow. So there was only one situation where there was a male and a female put in front of Dr. Maddow where he didn't hire them. Is that a question of fact, counsel? I don't think it is, Your Honor, because if just the simple fact that one time Dr. Maddow selects a male candidate over a female, despite the overwhelming statistical evidence that he hired 15 females in various of the 35 positions that he's been involved in. Administrative positions. There were no administrative positions other than one, Patricia Spencer was hired an administrative position over a male. And then, like the court pointed out, the plaintiff has the burden of showing this pretext to raise an issue of fact. There's no evidence in the record that there were other females that apply for administrative positions, number one. And number two, even though they say there's a lack of statistical evidence, there's no evidence presented by a plaintiff that they could have obtained during discovery that even if female had applied, there would have been a record of who the interview committee had recommended to Dr. Maddow, just like there was a record of that in this case. And the plaintiff did not produce any evidence from the interview committee that they had recommended females other than Dr. Morrow to administrative positions in the past that Dr. Maddow had passed over. And that's their burden. Counsel, was there a written hiring procedure at this college? Yes, there was, Your Honor. Was it in the record? It's a good question. I believe it was. We introduced it as an exhibit in support of our motion for summary judgment. I didn't see it. So if you could, when you're done, if you could just give the clerk where in the record the hiring procedures are, I would appreciate that. And in fairness to the court, because I don't want to misspeak, one of the things I do recall is that some of what they did was a matter of practice and had been done over the years. And I think that the undisputed evidence, and this is what I alluded to earlier, was that the practice and or policy that existed was followed in every one of these cases. Well, my question was, is there a written policy, hiring policy for the college? That's what I'm interested in, not the practice, historical practice. I understand. But I was just curious as to whether or not there is a written hiring procedure for the college. I believe for these type of positions there is, and I'll try to find it for the court and reference it for you, that there's some at least basic outline, if you will, as to the process as it develops. But in terms of getting back to Justice Kaczynski's question about a triable issue of fact, in order to have a triable issue of fact, there's got to be some undisputed facts about how this process developed. And Dr. Mather's sitting here, and it's undisputed that he has discretion. We may not like the fact that he has discretion. What about this whole incident with Rockmore and the two female candidates where the committee felt that Rockmore was totally unqualified and now wanted Rockmore and essentially was forced to hire one of the female. This was for the vice president of instruction position. Yeah, that was the woman. What's the story with that? Well, the story with that is the undisputed evidence is that Dr. Rockmore was appointed interim vice president of student services without an interview. What the other undisputed evidence is, is that Dr. Mora was also appointed interim dean for a year and a half without an interview. And what fact was ultimately left out of that was Dr. Rockmore didn't ultimately get that position. I believe that was the position Ms. Spencer, a female, ultimately received. So some of the declarations are somewhat misleading in terms of where the ultimate evidence panned out. But it's not unusual to put an interim person in a position without an interview. In fact, what we showed the lower court was. Once again, you didn't hear my question. I apologize, Your Honor. First of all, I don't know what this has to do with Mora and her position. But the question I ask, at this time, why don't you look at me and see the lips moving. The evidence, as I understand it, was that Mora wanted to hire Rockmore, given the permanent position of interim dean, of vice president of instruction, rather. And that there were two female candidates that were sought to be qualified, whereas Rockmore was considered to be not qualified. And Mora insisted he really wanted Rockmore. And eventually, one of the female candidates had to be forced on him. That's what I understand the record to be on that whole incident, that he fought tooth and nail and eventually had a female candidate forced on him. Well, Dr. Mather never admitted that. And the only evidence in the record on that was someone's personal opinion as to what happened. Dr. Mather was never asked that question at the time of his deposition. As I understand it, the only evidence that this person was, quote, forced on him was someone's personal opinion about that, who wasn't in the room and didn't ever hear Dr. Mather say that. And that was part of the problem with the declarations that we objected to, that that was someone's personal opinion as to what Dr. Mather made. He never admitted that. Did he dispute that Rockmore was his candidate, the candidate he was pushing? No, my understanding is there's no evidence to support that Dr. Mather felt that he was forced into hiring the other candidate. In other words, he's never admitted that that was someone else. Why don't you answer my question? No, that was his candidate, as I understand it. Okay. Initially. That's his candidate. And then he changed his mind. Any dispute that his colleagues considered him Rock for unqualified? I'm not aware of whether or not that was an issue that we raised at the lower court level at all, Your Honor. I stood that position. I don't think that was an issue that we brought up one way or the other as far as discovery was concerned. And Dr. Mather, I don't believe, was asked those questions at his deposition, so I don't think that was an issue that was before the court. The only issue that became before the court was ultimately Dr. Mather, who could make the decision one way or the other, whether he was pressured or not, made the decision to hire a female. And Dr. Mather, as the president of the college at that time, regardless of how other people felt about putting pressure on him, had the discretion to hire anyone he wanted, and he ultimately did, in fact, hire a female, and hired 14 other females. But, Counselor, he doesn't have discretion to hire anyone he wants if it's a discriminatory decision, does he? No, no. I meant in terms of the ultimate group of people that are placed in front of him. So to suggest he was somehow forced or manipulated into hiring a woman is not the record. The undisputed facts are he made that decision, and I agree with you, obviously, he can't do that. I just want to finish up, because I know I just have a little bit of time. I just wanted to point out the fact on the failure to remedy claim that there was no evidence. Isn't there evidence that the hiring committee thought Rockmore was unqualified, but they included him just to satisfy Mayer? At what point in time, Your Honor? For the vice president of instruction position, you mean? Yes. I don't believe so. For them to be unqualified? I don't believe so, Your Honor. I don't believe so. And, again, as far as our position would be, is ultimately Dr. Rockmore was not hired for that position and was passed over for a female. As far as the failure to remedy goes, I just wanted to point out to the Court that the Court was accurate in its review of the record. There are no prior complaints of harassment or discrimination before the district undertook their investigation. Yes, there was a letter to Dr. Lowe, or that was presented, about problems that females had, concern about violence, et cetera. But there was no indication at that point in time that people were lodging some sort of harassment or discrimination claim. And, obviously, once the district got that formal complaint, they took immediate action. We had somewhat of a 500-page report. Is the report sufficient if Mr. Poindexter remained in the workplace? Well, I think Dr. Poindexter was eventually placed on paid administrative leave. I was trying to look up that exact date, Your Honor, but he was placed on paid administrative leave. Eventually is the operative word. Was that adequate? Well, it would be adequate until at least someone does a preliminary investigation into what the allegations were. For example, some of those allegations were he was making changes in work schedules and things of that nature. And I don't think that there's a zero-tolerance standard under the law to remedy harassment by automatically placing somebody on paid administrative leave and taking them out of the workplace. I think that, in fairness to Dr. Poindexter, somebody had to do at least some preliminary investigation to determine the nature and seriousness of the allegations because in his position he had equal rights to stay in his position just like everyone else had equal rights to be free from certain discrimination. My question is toward not firing him but removing him from the workplace in view of the serious allegations of physical factors. What's your position on that, that he should remain there despite those allegations until the investigation is completed? No, Your Honor. In fact, I don't believe he did remain there. I could find the exact date, but my understanding was, and again, shortly after the formal complaint was filed, which I believe was in April, the end of April 2002, he was placed on paid administrative leave. Now, in terms of the prior complaint of harassment and violence, no, I would agree with you. At that point in time, he wasn't placed on paid administrative leave. He could have been reassigned to a different physical location. He wouldn't have to be put on leave but just a physical separation from the victims of his physical... Right. At that point in time, though, Your Honor, I don't think there was any indication from the college to draw an inference that his conduct was gender-related or discrimination-based at that point in time as opposed to a general, you know, violence allegation. I'm not trying to make short shift of that and suggest otherwise, but for purposes of what's before this Court, I don't think there was evidence that that was, you know, gender-based at that point in time per se. Other than the fact that he tended to be mean and I think as the investigation pointed out, you know, he had issues with males, females, you know, and I guess we could call him the equal opportunity offender. That's not a defense, though. I agree with you. I'm just suggesting that at that point, if you're looking at what the district should have done, they didn't know at that point in time that that's where it was going. And ultimately, I think there was, although there were some indications that he had poor management style, I don't think the investigator concluded any discrimination based on gender or race against anyone at all. All right. Thank you. Thank you. Thank you, Your Honor. We have a little time left. Just a few quick points, Your Honors. First of all, in terms of the date on which Mr. Poindexter was removed, it was in August, approximately four months after the report was initiated and the complaint was filed. As to the hiring policy, there is no written hiring policy in the district concerning this issue of having to advance three names and how that process occurs. There is some minimal policy over how the first two levels of review occur. And in fact, there is ample evidence in this record that this rule of three names was applied in a completely random fashion, depending upon who it was that they wanted to hire. As to Rockmore's hire, the first time that the defendant sought to promote Rockmore to the vice president of instruction when he was presented by the committee with the two women and Rockmore was deemed so unqualified that his name was not advanced, only two names were advanced. And in that particular instance, this was to replace the only woman of color who had been in an administrative position. This was to replace Dr. Pauline Murray, the vice president of instruction. So what the defendant attempted to do was to put Rockmore in who was unqualified. When he did not get Rockmore's name in the two that came to him, he ordered the committee to reconsider its position. And there is evidence in the record of that from two sources, Dr. Mora, the plaintiff in this case, who was on that selection committee, and Frank Marmoleo, another professor who was the college's affirmative action officer and who, after this selection process, was called in and accused of engaging in improper conduct because Rockmore was not advanced. Rockmore then was advanced to the position of acting vice president for student instruction without a single interview having occurred for that. And in fact, there was a vice... a person who was in that department, who had been in that department for many years, an African-American male, who was not even given the opportunity to apply. He simply put Rockmore... Mather simply put Rockmore in that position until he could open up another position, which occurred when Dr. Spencer quit six months into this job. So whenever Mather wanted to promote Rockmore in particular, his white male of choice, the rules didn't apply. There simply were no rules,  And as I've indicated, Your Honor, we had declarations in this case from two affirmative action officers, Dr. Ross, who sat... who was the affirmative action advisor on the organic chemistry selection and who was the department chair on the biology selection, and we had Dr. Marmoleo as well. Okay, your time's up. Thank you. Thank you. We'll take a recess before the remaining calendar. All rise. We'll take a recess. Stand and breathe. If you want me to point you out where it is you need to breathe. I need you to breathe. Do you have it?
judges: Canby, Kozinski, Rawlinson